## GRAND TRUNK WESTERN RY. CO. v. HEATLIE.
### SAME v. DREW.
### SAME v. WHITE.
#### Nos. 5762–5764.

Circuit Court of Appeals, Sixth Circuit.
April 15, 1931.

F. T. Harward and Victor Spike, both of Detroit, Mich. (Gilbert W. Hand, of Bay City, Mich., on the brief), for appellant.

T. J. Bresnahan and E. H. Groefsema, both of Detroit, Mich., for appellees.

Before DENISON, MOORMAN, and HICKENLOOPER, Circuit Judges.

MOORMAN, Circuit Judge.

These suits were heard together in the court below and were argued together in this court. They were brought to recover damages under the Federal Employers' Liability Act (45 USCA §§ 51–59) for injuries to James White and for the deaths of Ernest Drew and Walter Heatlie, occurring in a collision of two of appellant's east-bound freight trains at the village of Morrice, Mich. Drew was engineer, Heatlie fireman, and White a brakeman on train 484 which left

Battle Creek for Durand on the morning of the day of the collision. At Bellevue, 13 miles east of Battle Creek, the crew received an order to let train 486, a train of the same class, which had left Battle Creek later in the morning, pass, and then proceed. This was done. At Lansing, 31 miles east of Bellevue, train 486 took coal, leaving the coal dock to proceed on its run at 4:45 a. m. Train 484, traveling in the rear, arrived at the coal dock a few minutes later and left at 5:07 a. m., 22 minutes after 486. From Lansing to Morrice is approximately 21 miles. When train 486 arrived at Morrice, it stopped on the main track, and a few seconds thereafter 484 ran into its rear end, killing Drew and Heatlie, and injuring White. Between Lansing and Morrice there was no station at which an operator was on duty at night, and the safety of the trains, while being run between those points, depended upon the observance of operating rules 91 and 99. Rule 91 provided that "trains must keep not less than ten minutes apart unless the preceding train has arrived at the station ahead"; and rule 99, "when a train is moving under circumstances in which it may be overtaken by another train, such action must be taken as may be necessary to insure full protection; lighted fusees, red or yellow as the case may require, must be thrown off at proper intervals." On the trial of the cases the court submitted to the jury the single issue whether or not the rear brakeman on train 486, Given, observed rule 99 by throwing off lighted fusees at proper intervals. Upon this issue the jury found for the plaintiffs and returned verdicts for damages, upon which judgments were entered.

The main error assigned on these appeals is the refusal of the trial court to direct verdicts for the defendant. The argument in support of this assignment is based upon several related propositions of law, all of which rest essentially upon the broad proposition of lack of substantial evidence. The contention of appellant is that the proofs show that Given put out lighted fusees at proper intervals, some seven or eight, between Lansing and Morrice, and that the fog was so dense it was not possible for Drew, Heatlie, White, and conductor Marks, riding on the engine of 484, to see them. It is said that the only testimony to the contrary is the negative testimony of White. White testified that he was sitting on the fireman's side of the engine between these points looking ahead through the front glass or leaning out of the side looking ahead, and that he did not see any fusees. He also stated that a lighted fusee could have been seen through the fog for the distance of a thousand feet in front of the engine. The credibility of this latter statement was impaired by contradictory admissions made on cross examination. Upon this latter hypothesis, and in the light of other evidence as to the density of the fog, it is argued that White's testimony does not rise to the dignity of evidence.

Given testified that he put the fusees out from the rear steps of his caboose, but the fog was so dense he could not see whether they stuck in the ground or ties, or even whether they continued to burn after they reached the ground. His testimony as to putting them out was corroborated in some measure by one or two other witnesses, yet we cannot subscribe to the view that White's testimony, considered in the light of the other evidence, did not present a question for the jury. It has been held quite broadly in some jurisdictions, it is true, that evidence of the failure of witnesses to hear train signals does not make a case for the jury as against positive and affirmative testimony that the signals were given. We have never accepted that doctrine unqualifiedly, but have held that where a witness is in a position where he would normally hear, his failure to do so presents an issue as to the existence of the fact. Detroit Southern R. Co. v. Lambert (C. C. A.) 150 F. 555; Baltimore & O. R. Co. v. O'Neill (C. C. A.) 186 F. 13. In the present cases White testified to facts which would have enabled him to see the fusees if they had been placed on the track. This testimony, with his further testimony that he did not see them, raised an issue, in our opinion, as to whether they were put out. In reaching this conclusion we do not overlook the question of visibility, the contention of defendant being the fog was so dense that however much White may have looked, and however many fusees may have been placed on the track, he could not have seen them. On this point White testified on direct examination that a burning fusee could have been seen for a thousand feet in front of the engine, but on cross-examination admitted making prior statements to the effect that the distance would not have been further than 200 feet. It is insisted that these former admissions, partially reiterated on cross-examination, discredited the direct testimony as a matter of law. We cannot agree that they did. Rochford v. Pennsylvania Co., 174 F. 81 (6 C. C. A.); Chicago N. O. & T. P. R. Co. v. Rimmer, 37 F.(2d) 668 (6 C. C. A.).

■ But plaintiffs did not rely solely upon the testimony of White as to the density of the fog and the visibility of lights. Blumberg, a drover riding on the caboose of train 484, said that immediately after the wreck he could see a man walking away from him at a distance of 200 or 250 feet. Another witness, Vreeland, was in her home 400 feet from the depot. She heard the crash, and shortly after saw her neighbor 200 feet away run into his house. The witness went down to the wreck and could see it 400 feet before she reached it. There was evidence showing the denseness of the fog did not abate for half an hour after the collision. Twenty minutes after it occurred, Mackey, a farmer, looking through his bedroom window saw the depot and the depot lights 400 feet away. The fusee gives a brighter and stronger light than a lighted lantern or marker on a caboose, and just before the collision White saw the markers on the caboose of 486, 200 or 250 feet away. Scouten, the conductor on train 486, a witness for appellant, testified that within 15 minutes after the collision he went to the front part of his train, that his engine was about six car lengths from the order board at the station, and that when he got to the head end of his train he could see the order board, which was red against him. Being recalled the following day, however he corrected his testimony, stating that the east end of his train was considerably farther west of the order board, and that he could not see the board when he reached his engine. Again, Taylor, a watchman at a station about two miles from Morrice, testified that he was 15 feet from the track when the caboose of No. 486 passed, and that he could see Given on the end of the caboose displaying an unlighted fusee in his hand.

The foregoing evidence tends to show that if lighted fusees had been put out, they could have been seen by the crew of 484. White testified that he was constantly looking out and saw none. Accordingly, on this issue, that is, whether Given put out the fusees as required by rule 99, the evidence was for the jury. Begert v. Payne, 274 F. 784 (6 C. C. A.).

■ The contention that the verdicts are against the weight of the evidence cannot be considered, as this court can go no further than determine whether there is substantial evidence to support them. Nor is it the province of this court to determine whether the verdicts are excessive. That

question lay with the court below upon the motion for a new trial. Detroit T. & T. Co. v. Pratt (C. C. A.) 2 F.(2d) 193; N. Y., L. E. & W. R. Co. v. Winter's Adm'r, 143 U. S. 60, 12 S. Ct. 356, 36 L. Ed. 71; Southern Ry.-Carolina Division v. Bennett, 233 U. S. 80, 34 S. Ct. 566, 58 L. Ed. 860. In the Drew case the court made it a condition of the overruling of the motion for a new trial that plaintiff accept a reduced verdict. This she did. We find no abuse of discretion in the refusal to require a further reduction in that case or any reduction in the other cases. Drew was a young man with a life expectancy of 28 years, earning more than $3,000 a year. He had a wife and five minor children. Heatlie was 25 years of age, having an expectancy of more than 38 years. He was steadily employed as a fireman, with prospects in due course of being promoted to the more lucrative position of engineer. He had three children. Computations were made of sums which, at 5 per cent. interest, the principal to be used as necessary and consumed at the end of the expectancy, would produce an annual income equal to what each of these men might reasonably have been expected to contribute to his family, and it is not inaccurate to say that such sum does not, in either case, exceed the judgment given. This leaves out of consideration the care, instruction, advice, and guidance that they might reasonably have been expected to give their children. Norfolk & W. R. Co. v. Holbrook, 235 U. S. 625, 35 S. Ct. 143, 59 L. Ed. 392. The verdict in the White case concededly cannot be justified upon the sole basis of compensation for total disability at the rate at which White was being paid. He was, however, 25 years of age, in good health, steadily employed, and had the usual prospect of promotion with increased wages. He lost a foot, part of one hand, was terribly scalded, underwent seven operations—three general and four local—and his suffering was frightful. At the time of the trial, more than a year after the accident, he was an invalid. It was expected that at best he would be an invalid or semi-invalid for two more years. His physician thought he would never be able to engage in a gainful occupation. The trial court saw the man and was of opinion that the damages were not excessive. We have no reason to believe that the court abused its discretion in not requiring him to remit a part of the verdict as a condition to the overruling of the motion for a new trial.

The judgments are affirmed.